UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON
CIVIL ACTION NO.: 04-121-JGW

Eastern District of Kentucky
FILED
AUG 15 2005
AT COVINGTON
LESLIE G WHITMER
CLERK U S DISTRICT COURT

DEMBA CAMARA,                                                                         PLAINTIFF

v.

SCHWAN'S FOOD
MANUFACTURING, INC., et al.,                                  DEFENDANTS

## MEMORANDUM OPINION AND ORDER

On May 19, 2005, defendants moved to dismiss two of plaintiff's claims. Plaintiff filed a response, as well as a motion to file a second amended complaint in order to allege a new claim. Plaintiff seeks oral argument on his motion. Defendants oppose the proposed amended complaint, arguing both prejudice and futility. The parties have consented to disposition by a magistrate judge pursuant to 28 U.S.C. §636(c). For the reasons stated herein, defendants' motion to dismiss will be granted and plaintiff's motion to amend will be denied. Plaintiff's request for oral argument will also be denied as unnecessary for disposition of the pending motions.

The background of this litigation was recently set out in this court's Memorandum Opinion and Order of April 15, 2005, but is reiterated here for the convenience of the court:

### I. Background

Many of the relevant facts are undisputed for purposes of the present motions. Plaintiff Camara is a fifty-one year old man born in Mauritania (Africa) who came to the United States seeking asylum status. He has possessed a valid I-94 card granting him asylum status, valid indefinitely, since October 5, 1999.

1

The defendants are engaged in food manufacturing with a plant in Florence, Kentucky.[1] The defendants have employed approximately 1,050 to 1,150 workers at the Florence plant since 2001. Of the total employees in Florence, approximately 25-30% are aliens. Defendants retain a law firm as outside counsel for immigration matters.

At the beginning of 2001, plaintiff moved to Cincinnati and obtained a job with Delta. Plaintiff became employed with the defendants in November 2001.[2] On November 28, 2001, Human Resources Supervisor Diana Cripe met with plaintiff to complete his Form I-9 paperwork (required under U.S. law). On that form, Mr. Camara stated that he was an alien authorized to work in the U.S. Plaintiff presented two identification documents - an Employment Authorization Document ("EAD"), and an Ohio Driver's license (a List B document). The I-9 form requires that new employees provide either one document from List A, or alternatively, two documents -one from List B and one from List C. Since the EAD is a List A document, the driver's license (List B) was not required by law.

Within a week of being hired by defendants as a Sanitation Attendant, plaintiff sustained a work-related injury resulting in the amputation of three fingers of his left hand. Plaintiff remained off work for approximately three months after that injury for extensive rehabilitation. He returned to a modified position at Schwans/SSE Manufacturing, and received a merit increase in June of 2002.

**The First Termination**

In mid-October 2002, Ms. Cripe called plaintiff to a meeting concerning the expiration of his EAD card on October 16, 2002. Plaintiff asked for time to go to the Immigration Office prior to their meeting; Ms. Cripe agreed, suggesting that he take his passport and get it stamped to specify that he was permitted to work. Plaintiff subsequently met with an INS worker but alleges that he was told that she would not stamp his passport because it was unnecessary for an asylee, and plaintiff already had an I-94 card which stated on its face that he was an asylee. The following day, plaintiff alleges that he related the INS's advice to Ms. Cripe - a fact she disputes. Plaintiff also advised Ms. Cripe that he had previously applied for a renewed EAD some 67 days prior to the date of the scheduled expiration.

Ms. Cripe terminated plaintiff's employment on October 21, 2002 based

---

[1] The defendants are related corporate entities.

[2] Plaintiff was hired by SSE Manufacturing, which is now Schwan's Food Manufacturing.

2

upon the lack of a new EAD card or passport stamp. A few weeks later, plaintiff received a new EAD card and reapplied for employment with defendant. Plaintiff testified that he attempted to call Ms. Cripe about his application for approximately three months, but that she did not return his calls. Finally, plaintiff faxed a letter to the company's headquarters in Minnesota, explaining the circumstances of his termination and application for rehire. Following that fax, Ms. Cripe contacted and rehired plaintiff. Plaintiff completed a new Form I-9 on December 17, 2002 and submitted his new EAD card and his social security card (a List C document). The EAD was noted to expire on October 17, 2003.

**The Second Termination**

Sometime before the expiration date of the EAD card, plaintiff applied for a new EAD. Ms. Cripe testified that she recalls having contacted plaintiff's supervisor to advise him of the upcoming expiration of the EAD card, and to so notify plaintiff, but plaintiff disputes receiving notice from defendant.[3] In any event, the new card was not issued prior to the expiration date.

On Friday, October 17, 2003, plaintiff reported to work and was told by his line leader, Ousman Sanon, that he could not work because of the expired EAD card. Mr. Sanon also advised plaintiff that Ms. Cripe wanted to see him the following Monday in the HR office to discuss the problem, and that he would not be permitted to work until then. Plaintiff testified that he did not report to Ms. Cripe's office on Monday because the branch office of the BCIS (formerly known as INS) only had appointments on Tuesdays to discuss work authorization issues.

Plaintiff alleges that he went to the BCIS office on Tuesday, October 21, 2003 and met with employee Tina Richmond. Plaintiff alleges that Ms. Richmond told him she was tired of these problems, that she made a copy of some rules and wrote a note on the pages with an explanation, then signed and stamped the documents. Ms. Richmond told plaintiff to take the documents to his employer, along with his I-94 card, and "tell them you don't need work authorization." On the papers, Ms. Richmond wrote that "Subject has an application pending for a new employment card. Once it has been pending for 90 days (11/18/03), he can appear at this . . . [to receive an] interim EAD. However as an asylee, he is not required to have the EAD. See his I-94." The photocopied

---

[3]Ms. Cripe testified that in 2001 or 2002, HR would send memos out to department supervisors every 30 days containing the names of employees whose cards were due to expire in approximately 60 days, with a request that the employee meet with HR to discuss the problem. The same policy existed in 2003, except that the memo would contain the names of those employees whose cards were due to expire in 90-120 days. However, no monthly list documents exist with Demba Camara's name on them.

3

policies or procedures stated that "once an individual receives asylee status, by regulation that asylee is authorized to work as of the date of the grant, and this is true regardless of whether the BCIS has issued the asylee an EAD."

Plaintiff met the next day with Ms. Cripe. Mr. Sanon, the line leader, was also present. The parties disagree as to what occurred at the meeting. Plaintiff alleges that he presented a receipt documenting his application for a new EAD card, and advised Ms. Cripe that he had been told by BCIS that he did not need an EAD card but could use his I-94 card. He attempted to show Ms. Cripe the papers he had received from BCIS as well as his I-94 card, but Ms. Cripe refused to accept the documentation. Plaintiff testified that Ms. Cripe stated that it was defendants' policy that he must produce an unexpired EAD card to remain employed. Mr. Sanon also testified that plaintiff attempted to produce documentation from INS but that Ms. Cripe did not accept it because she "wanted to see a card."

Ms. Cripe has denied in deposition testimony that plaintiff showed her any paperwork from BCIS or his I-94 card or that he told her he was an asylee. However, the defendants *previously admitted* in their responses to plaintiff's requests for admissions that "Dembra Camara provided Human Resources personnel a note written by the INS and/or USCIS on October 21, 2003, explaining that "As an asylee, [Mr. Camara] is not required to have the [EAD] in order to be authorized to work." Ms. Cripe also denies plaintiff's allegation that she informed him that it was company policy to require an unexpired EAD card.

Ms. Cripe terminated plaintiff's employment on October 21, 2003 for insufficient evidence of employment authorization. The termination record initially stated that plaintiff was terminated for failure to "call or show for work on October 18, 19 or 20," as well as his inability "to produce updated I-9 info in a timely manner." However, at plaintiff's request, Ms. Cripe agreed to scratch out the part of the termination record referring to plaintiff's failure to show up to her office in light of the fact that plaintiff could not go to the INS office until Tuesday. Ms. Cripe testified that she scratched out the language because the "real issue is that [Demba] was unable to present employment authorization."

Upon his termination, plaintiff attempted to secure other employment without success. Plaintiff opened the Westwood African Store as a sole proprietor in November 2003, but the business has operated at a net loss.

In the April 15, 2005 order, the court granted plaintiff's motion to amend to plead a new claim that plaintiff's first claim of discrimination was not intended to be based upon national

4

origin but was in fact a claim of discrimination based upon citizenship status. The court permitted the amendment in part because plaintiff's original complaint contained all relevant factual allegations relating to his citizenship status as an asylee.

In the same order, the court permitted plaintiff to amend his third claim to clarify that it is a claim for document abuse, over defendant's objection to that amendment. Plaintiff's original complaint had inartfully characterized his third claim as wrongful termination, although the basis for the termination clearly included a reference to federal regulations which prohibit document abuse. The court noted in permitting the amendment that prejudice to the defendants was minimal since no trial date had then been set, and "all discovery conducted to date has been geared toward the issues of plaintiff's citizenship status as an asylee and the document abuse issue, such that defendants have been aware of the nature of the claims and no further discovery will be required."

## II. Defendant's New Motion to Dismiss

This court previously granted defendant's motion for summary judgment on plaintiff's retaliatory discharge claim. However, the court denied defendant's prior motion for summary judgment on plaintiff's citizenship claim (alleging discrimination based upon plaintiff's asylee status), and on plaintiff's amended "document abuse" wrongful termination claim. In a new motion to dismiss, defendants seek to dismiss plaintiff's amended citizenship status claim.

Defendants argue, correctly, that the Kentucky Civil Rights Act and Title VII do not recognize a discrimination claim based on citizenship status. Plaintiff concedes that the case is not properly pled under current law, but seeks to amend the claim to plead it under 42 U.S.C. §1981. As explained herein, plaintiff's motion to file a second amended complaint will be

5

denied. Thus, defendants' motion to dismiss plaintiff's citizenship status claim will be granted.

In addition to the dismissal of the citizenship claim, defendants seek dismissal of plaintiff's retaliatory discharge claim, which claim was included in plaintiff's amended complaint notwithstanding the court's previous grant of summary judgment to the defendants. Plaintiff concedes that the claim was improperly included in the amended complaint; therefore, it will again be dismissed.

### III. Plaintiff's Second Motion To Amend

Plaintiff originally pleaded his citizenship status claim as one for discrimination based upon national origin - a claim on which defendants would have been entitled to summary judgment since there was no evidence that plaintiff was discriminated against based upon his nationality. However, plaintiff was permitted to amend or "clarify" that his original claim related to his "citizenship status" and not strictly to his national origin. At the time of plaintiff's first amendment, neither party raised the issue presented now - the legal basis for the amended claim. The court permitted the first amendment both because plaintiff had pleaded all relevant facts in the original complaint, and because plaintiff represented that all discovery conducted to date has been geared toward the issues of plaintiff's citizenship status as an asylee and the document abuse issue, such that defendants have been aware of the nature of the claims and no further discovery would be required.

Conceding that neither the originally pleaded Kentucky Civil Rights Act nor Title VII provide a legal basis for the amended citizenship status claim, plaintiff now seeks to amend for a second time to assert 42 U.S.C. §1981 as the statutory basis of the claim. The defendants oppose the second proposed amendment, arguing that they would be substantially prejudiced by

6

the second amendment and that further amendment would be futile.

Rule 15(a) requires that courts freely permit amendment of pleadings only "when justice so requires." Discovery originally closed on March 17, 2005, except for discovery compelled by the court on April 15, 2005.[4] On May 18, 2005, the court scheduled a final pretrial conference for October 21, 2005 with a jury trial to commence on November 8, 2005. The defendants argue that in this case, justice "does not require this Court to allow Plaintiff to engage on a continuous fishing expedition in changing the claims until he pleads a cause of action that is viable." If this court were to permit plaintiff to amend his citizenship claim a second time, defendants claim that they will be substantially prejudiced.

Defendants' primary argument of prejudice is misguided, because it is based upon the incorrect assertion that the elements of a citizenship status claim presented under 42 U.S.C. §1981 differ from the elements of the claim under Title VII and/or the Kentucky Civil Rights Act. *Johnson v. University of Cincinnati*, 215 F.3d 561, 573 at n. 5(6th Cir. 2000)(noting that the elements of a claim under Title VII and 42 U.S.C. §1981 are the same); *Willie Love Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1250 (6th Cir. 1995)(noting that claim under Kentucky Civil Rights Act requires proof of same elements as under Title VII). Assuming that the elements differ, defendants contend that they would need to re-depose plaintiff and conduct additional written discovery, as well as employ experts to proffer testimony to address the §1981

---

[4] Defendants were originally ordered to produce the requested discovery within twenty days of the court's April order. However, the court noted in a subsequent order dated May 18, 2005 that defendants were in the process of producing the previously-ordered discovery, "after which plaintiff may require further depositions." On August 11, 2005, plaintiff's counsel verbally notified the court that she intends to issue a subpoena in an attempt to depose an INS official in Washington, D.C. on a date in early September.

7

claims. Because the elements do not differ, however, the court assumes that no further discovery would be required. Nevertheless, the court finds that the defendants would suffer some prejudice from the proposed amendment. Unlike at the time of the initial amendment, pretrial and trial dates have now been set. An amendment this close to trial is presumptively prejudicial - notwithstanding the fact that - at least theoretically - the discovery conducted to date should suffice.

Aside from the presumptive prejudice, the court agrees with the defendants that further amendment would be futile, though for slightly different reasons than those advocated by defendants. The defendants argue futility because the evidence "supports the contention that Defendants employ numerous individuals who have citizenship other than in the United States." Defendants contend that "any impediment to Plaintiff's contracting for at-will employment was based solely on Plaintiff not producing the necessary documentation that establishes his ability to work," which fact "has nothing to do with his citizenship status."

Defendant's argument is close to the mark. The essence of plaintiff's claim is that defendants improperly demanded documentation that was unnecessary in light of plaintiff's asylee status. Notably, plaintiff does *not* contend that the defendants discriminated against him based upon his lack of U.S. citizenship.

Plaintiff cites to *Anderson v. Conboy*, 156 F.3d 167, 179 (2nd Cir. 1998) to support his claim that §1981 prohibits the discrimination he alleges. However, in *Anderson v. Conboy* the plaintiff had alleged "alienage" discrimination based upon his status as a non-U.S. citizen. The plaintiff there, a former union business representative, was terminated from his position solely on the basis that he was not a U.S. citizen. The Second Circuit was asked to determine whether

8

§1981 prohibits private alienage discrimination, and concluded that it does. Other courts have reached a contrary conclusion, holding that §1981 does *not* extend to prohibit private alienage discrimination. *See e.g., Bhandari*, 829 F.2d at 1349, 1351-52.

In contrast to *Anderson v. Conboy*, the plaintiff here claims he was discriminated against based upon his distinct classification as an ayslee rather than strictly based upon his alienage. The Sixth Circuit has yet to address the issue of whether private alienage discrimination is prohibited by §1981. *See Rodrigues v. Martin Marietta Corp.,* 829 F.2d 39 (6th Cir. 1987)(Table, text available on Westlaw). However, plaintiff cites no published case from any court to support his claim that private discrimination against a specific class of non-citizens - asylees- is prohibited by §1981. In light of the split among the circuits on the broader issue of private alienage discrimination and the unique contours of plaintiff's claim, this court concludes that plaintiff's claim does not fall within the ambit of 42 U.S.C. §1981. The presumptive prejudice to the defendants given the impending trial date and close of discovery only adds to the court's conviction that further amendment should be prohibited.

## V. Conclusion and Order

For the reasons stated herein, **IT IS ORDERED THAT:**

1. Defendants' motion to dismiss [DE #39] is **granted**. Plaintiff's retaliatory discharge claim and plaintiff's citizenship status claim shall be **dismissed with prejudice**;

2. Plaintiff's second motion to amend his complaint and request for oral argument [DE #45] is **denied;**

3. This case will proceed to trial solely on plaintiff's document abuse discrimination claim.

9

This ___15___ day of August, 2005

*J. Gregory Wehrman*
J. GREGORY WEHRMAN
UNITED STATES MAGISTRATE JUDGE